**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | **FINDINGS OF FACT,** |
| | **CONCLUSIONS OF LAW,** |
| **vs.** | **AND ORDER** |
| | |
| **TERRY KARL LUND and KEITH ROBERT CARLSON** | |
| | **Case No.  2:05CR572 DAK** |
| **Defendants.** | |

This matter is before the court on Defendants Terry Karl Lund's and Keith Robert Carlson's Motions to Suppress.  The parties stipulated to vacating the evidentiary hearing, and opted instead to submit the motions on the briefs.   The court has carefully considered all pleadings, memoranda, and other materials submitted by the parties.  Now being fully advised, the court renders the following Findings of Fact, Conclusions of Law, and Order.

**FINDINGS OF FACT**

This case involves a search of two different homes–the Lund residence and the Carlson residence–both located in Kearns, Utah.  The searches were conducted on June 30, 2005, based on the same "no-knock" search warrant.  Before these searches occurred, an investigation of the two residences was conducted, and two concerned citizens ("CC1" and "CC2") provided information that led Detective April Morse ("Detective Morse") to believe that clandestine methamphetamine labs were present at each of the two residences.

CC1 said that Terry Lund was involved in the possession and distribution of controlled substances and provided a log showing the large quantity of traffic that frequented Lund's residence at all hours of the day and night, with the stays lasting only a short period of time. Detective Morse knew, from her training and experience, that this activity was consistent with the distribution of controlled substances.  CC1 later informed Detective Morse that he/she had seen Terry Lund and Keith Carlson together at both of their residences, and that they spent "a great deal of time" behind Carlson's residence in an unattached shed, at strange hours, such as two o'clock in the morning.

CC1 also continued keeping a log of the short stay traffic at Lund's residence, and supplied this log, for the month of May 2005, to Detective Morse.  Detective Morse performed a records check on the license plate numbers listed in the log.   The records check showed that vehicles belonging to Adele Hagen, Curtis Stevens, Douglas Hayes, and Keith Carlson were among those who visited Lund's residence.  Each of these individuals had an arrest history involving illegal drugs.   Additionally, CC2 stated that there was suspicious activity occurring at Lund's residence, and that it was possibly drug related.

Detective Morse spoke with Detective Joe Studsrup of the Salt Lake County Sheriff's Office and learned that Detective Studstrup had conducted two controlled buys of methamphetamine from Lund's residence on March 26, 2003, and April 9, 2003.   Detective Morse learned that one of the purchases was directly from Terry Lund, and that the purchases were for approximately one gram of methamphetamine.

Detective Morse learned from Taylorsville City Detective Tracy Wyant that on May 25,

2004, Detective Wyant received information from a concerned citizen ("CC3") that Terry and Kris Lund were distributing methamphetamine from their residence.

Detective Morse also learned from Detective Gordon Chow that on March 30, 2005, he interviewed Lamana Pata ("Pata") at the Adult Detention Center, and that Pata had told Detective Chow that Lund was in possession of a clandestine methamphetamine laboratory and that it was set-up in the basement of Lund's residence.

Detective Morse also received information from a fourth citizen ("CC4"), who stated that there was a lot of vehicle traffic at Lund's residence and that Lund did not routinely set out his garbage for pickup.   Detective Morse was informed by Detective Chow that after Detective Chow had spoken with Pata, Detective Chow had attempted a "trash cover" at Lund's residence, but that Lund had not taken his garbage out to the curb for pickup.

Detective Morse attempted trash covers at Lund's residence on June 3, 2005, and June 17, 2005, but they were unsuccessful because Lund had not placed the garbage out for pickup. CC1 informed Detective Morse that Lund had previously taken garbage bags from his home in the early morning hours, placed the bags in the back of his truck, and left the area.

Detective Morse conducted a successful trash cover at Lund's residence on June 10, 2005. Detective Morse found garbage bags that were consistent with those described by CC1.   A document was found that listed Dave Levi Pyper ("Pyper") as a resident at Lund's residence.   A background check on Pyper was performed, and it was discovered that he had an arrest record for possession of drug paraphernalia.  A search of local iodine purchase records showed that Pyper had purchased crystallized iodine on two occasions.  Detective Morse

knew from training and experience that iodine is the main precursor in the manufacture of methamphetamine.

Detective Morse conducted a "trash cover" at Carlson's residence on June 17, 2005. Detective Morse located one pair of rubber gloves with significant iodine staining, one empty box of equate brand cold and allergy medication containing pseudoephedrine, coffee filters stained with iodine, and a newspaper stained with iodine.  Detective Morse knew from training and experience that pseudoephedrine and iodine are main precursors in the manufacture of methamphetamine.   Detective Morse also found residency documents that showed that Keith Carlson was a resident of that address in Kearns, Utah.

After checking state and local records, Detective Morse discovered that Terry Lund had a prior arrest for possession of precursor chemicals and attempted manufacturing of methamphetamine, and that Keith Carlson also had a prior arrest for possession of a clandestine drug lab in 2002.

Detective Morse provided an affidavit for the search warrant in which she noted that "[p]hysical harm may result to any person if notice was given, and/or the property sought may be quickly damaged, destroyed, or disposed of."   The reasons provided by Detective Morse include:

1.      the requested warrant was "to be served in conjunction with [ ] other search warrants," which could lead to the residents fleeing, the residents alerting the occupants of the other residence if the search warrants were not served at the same time, or to the possible destruction of evidence;

-4-

2.      "the persons living at or otherwise frequenting the premises" were "abusing stimulants, namely methamphetamine," and Detective Morse knew from her "training and experience that individuals who are abusing methamphetamine often exhibit unpredictable, paranoid, and potentially violent behavior while under the influence of the stimulant";

3.      Curtis Stevens, a person whose vehicle had been seen at Lund's residence, had previously been arrested for aggravated assault; Douglas Hayes, whose vehicle had been seen at Lund's residence, had been arrested for carrying a concealed weapon and for making terroristic threats, and had also been charged with discharge of a firearm and possession of a handgun by a restricted felon; Dave Pyper, a purported resident of Lund's residence, had previously been arrested for carrying a concealed weapon; and Defendant Carlson had also previously been arrested for possession of a weapon by a restricted felon.

4.      Detective Morse knew "from training and experience that methamphetamine manufactured [in] a clandestine laboratory environment [is] often manufactured in quantities that are easily concealed or destroyed."

## CONCLUSIONS OF LAW

Defendant Carlson challenges both the existence of probable cause for the search and the execution of the no-knock search warrant.   Defendant Lund challenges the existence of probable cause.   These issues are discussed below.

The Fourth Amendment requires that a search warrant must be supported by probable

cause.   Probable cause must be based upon "more than mere suspicion but less evidence than is necessary to convict." *United States v. Burns*, 624 F.2d 95, 99 (10th Cir.1980).  Probable cause "requires a nexus between suspected criminal activity and the place to be searched." *United States v. Corral-Corral*, 899 F.2d 927, 937 (10th Cir.1990).  To obtain a search warrant, the affidavit "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." *United States v. Danhauer*, 229 F.3d 1002, 1005-06 (10th Cir.2000).   In determining whether probable cause exists, the issuing magistrate judge must examine the "totality of the circumstances" set forth in the affidavit. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Simpson*, 152 F.3d 1241, 1246 (10th Cir.1998);  *United States v. Tisdale*, 248 F.3d 964, 970 (10th Cir.2001).   "[W]here [the underlying] circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." *United States v. Ventresca*, 380 U.S. 102, 109 (1965). "[A]ffidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion." *Id.* at 108.

As a general rule, a reviewing court should afford the magistrate judge's ultimate probable cause decision "great deference." *United States v. Rowland*, 145 F.3d 1194, 1204 (10th Cir.1998).   Nonetheless, it is the duty of the reviewing court to "ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Gates*, 462 U.S. at 238-239 (1983) (internal quotations omitted).  A reviewing court is to interpret search warrant affidavits in a

common sense and realistic fashion. *United States v. Ventresa*, 380 U.S. 102, 108 (1965).   The issuing judge is entitled to go beyond the averred facts and draw upon common sense in making reasonable inferences from those facts.  *United States v. Rowland*, 145 F.3d 1194, 1205 (10th Cir.1998).   A reviewing court should uphold the warrant as long as the issuing judge had a "substantial basis for ... conclud[ing] that a search would uncover evidence of wrongdoing." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (internal quotation marks omitted).

     The court finds that there was probable cause supporting a search of both Defendant Carlson's and Defendant Lund's residences for evidence of drug manufacturing and distribution activities.   In this case, the supporting affidavit sets forth facts that would lead a prudent person to believe there is a fair probability that contraband or evidence of a crime would be found in a particular place.  *See United States v. Bashan*, 268 F.3d 1199, 1203 (10th Cir. 2001). The issuing judge had a substantial basis for determining that probable cause existed.

     Defendants Lund and Carlson were seen at both residences.  Both had a history of arrests for activities related to the manufacture of methamphetamine.  It was very probable that Defendant Lund was selling drugs because he sold drugs to an undercover officer, he was reported to be manufacturing methamphetamine and selling drugs to other individuals, and the large volume of short-stay traffic at his residence was an indicator of illegal activity.  Several cars seen by CC1 at Lund's residence were owned by individuals with a history of illegal drug activity.  Because Defendant Lund was seen at both his residence and Defendant Carlson's residence, it was probable that drugs, records of sales, or equipment used to manufacture drugs were located at both residences.  Particularly noteworthy was Defendant Lund's presence at

-7-

Defendant Carlson's residence at odd hours, such as two o'clock in the morning, and their use of the shed at these odd hours. Dave Pyper lived at Defendant Lund's residence. He had a criminal history related to drug activity, and he purchased a precursor chemical, crystallized iodine, on at least two occasions.

Defendant Lund and Defendant Carlson each spent time at both residences, thus making possible the transportation of these precursor chemicals from Lund's residence to Carlson's. The trash cover conducted at the Carlson residence resulted in the discovery of evidence that showed Defendant Carlson's involvement in methamphetamine production and indicated that the manufacturing process was going on at his residence. Although Defendant Carlson argues that one box of cold medicine is not suspicious, the level of suspicion increases dramatically when the used box of pseudoephedrine is found in the same garbage as items stained with iodine, because both are precursor chemicals used in the production of methamphetamine.

As Detective Morse stated in the affidavit she has received specialized training in the investigation of clandestine laboratories which enabled her to identify iodine stains, especially when those stains are located on materials that are commonly used during the production of methamphetamine, such as coffee filters and rubber gloves. Thus there was a fair probability that contraband or evidence of illegal activity would be found at Carlson's residence, particularly when the facts are viewed under the totality of the circumstances.

The court also finds that the officers relied on the search warrant in good faith and thus the evidence should not be suppressed in any event. In *United States v. Leon*, the United States

-8-

Supreme Court stated that where an officer, acting in objective good faith, has obtained a search warrant from a judge or magistrate that is ultimately found to be unsupported by probable cause, any evidence obtained from the resultant search or seizure may be admitted as evidence in the prosecution's case in chief, despite the fact that it is illegally obtained. 468 U.S. 897, 913 (1984). The Court held the evidence should not be suppressed because the magistrate made the error, not the officer who reasonably relied on the magistrate's action. *Id*. 468 U.S. at 916-17. The exclusionary rule is considered to have deterrent effect on the conduct of police officers, but is not considered to have a deterrent effect on the activity of magistrates, who are judicial officers. *Id*. Here, officers relied on the State Court judge's issuance of the warrant to search the listed residences. There is no evidence that the officers acted in bad faith in obtaining information or in securing the search warrant. Defendant Carlson has not produced any proof of deliberate misrepresentations or a reckless disregard for the truth contained in the affidavit. Therefore, the evidence should not be suppressed in any event.

Finally, the court finds that execution of the no-knock search warrant was constitutionally reasonable. "'[T]he Fourth Amendment incorporates the common law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry.'" *Richards v. Wisconsin*, 520 U.S. 385, 387 (1997) (quoted in *U.S. v. Musa*, 401 F.3d 1208, 1212 (10th Cir. 2005)). However, this requirement may be waived if there is "'. . . a threat of physical violence' or 'where police officers have reason to believe that evidence would likely be destroyed if advance notice were given.'" *Richards*, 520 U.S. at 391 (quoting *Wilson v. Arkansas*, 514 U.S. 927, 936 (1995)).

In this case, a search warrant was granted, and the officers were not required to give notice of authority or purposes.  "We should not be quick to second-guess the decision to effect a no-knock entry."  *U.S. v. Musa*, 401 F.3d 1208, 1213 (10th Cir. 2005).   In *Richards v. Wisconsin*, the Court noted that upon review of a no-knock entry, "it is the duty of a court confronted with the question to determine whether the facts and circumstances of the particular entry justified dispensing with the knock-and-announce requirement." 520 U.S. at 394.  The appropriate standard to determine whether the announcement requirement was appropriately waived is that the officers had "reasonable suspicion," to believe that "knocking and announcing their presence. . . would be dangerous or futile. . ." but "[t]his showing is not high. . ." *Id.*

Reasonable suspicion of physical danger and possible destruction of evidence was present in this case, as outlined below.

### A. Physical Danger to the Officers and Others

A no-knock warrant may not be valid if it is only based on the crime to be charged, such as narcotics distribution.  In *U.S. v. Nielson*, a no-knock warrant was held to be invalid because law enforcement officers had "failed to demonstrate that they had an objectively reasonable suspicion that knocking and announcing would be dangerous or futile." 415 F.3d 1195, 1197 (10th Cir. 2005).   The court noted that law enforcement officers had not claimed that Nielson was distributing narcotics, they had also not claimed that he had previously engaged in violent conduct, and the court noted that although there was a likelihood that Nielson possessed guns, that was not enough to show "an increased risk beyond that normally faced by law enforcement officers," especially since the weapon was in the garage and the officers had no

-10-

information that would show that he had access to the garage.  *Id.* at 1201.

As described above, some factors, existing alone, may not be sufficient to validate a no-knock entry, but such factors, if considered together, may be sufficient to uphold a magistrate's decision to issue a no-knock warrant.  In this case, the affidavit listed several reasons that justified the use of a no-knock warrant because of potential danger to the officers and others.  These are: (1) simultaneous service could increase the danger because the suspects could flee, evidence could be destroyed and/or secreted, and persons at the residence being searched could warn persons at the other residence; (2) users of methamphetamine may become violent; and (3) others that were likely to be present or had previously been present at the premises to be searched had previously been arrested for weapons violations or for violent acts.

Officers conducting the search faced possible danger because more than one residence was to be searched.  The residences are close enough in proximity to enable residents to flee to or alert the residents of the other premises, which would place the officers at significant risk if residents were informed of the execution of an impending search warrant.  Detective Morse also noted that the evidence could be destroyed or secreted.

She also noted that it was likely that users of methamphetamine would be located at the residences to be searched. "Chronic methamphetamine abuse can lead to psychotic behavior including intense paranoia, visual and auditory hallucinations, and out-of-control rages that can result in violent episodes." *ONDCP Drug Policy Information Clearinghouse FACT SHEET, at* http://www.whitehousedrugpolicy.gov/publications/factsht/methamph/ (accessed on February 2, 2006).   This possibility of paranoia or aggression was noted by Detective Morse in

the affidavit as a possible reason for allowing a no-knock entry to the residences.

In addition, Defendant Carlson was sufficiently attracted to guns to have been arrested for illegally possessing a firearm, "despite the severe consequences faced by a felon found in possession of a firearm." *Musa*, 401 F.3d at 1214.

In this case, Detective Morse conducted a trash cover that showed a strong likelihood that chemicals used in the manufacture of methamphetamine were present at the residences. The danger inherent to the volatile chemicals used in clandestine methamphetamine laboratories has been cited by several courts. *See U.S. v. Hernandez*, 252 F. Supp.2d 1190, 1193 (D. Kan. 2003) (agent's actions were reasonable under the Fourth Amendment because of knowledge of dangers posed by defendant and dangerous nature of methamphetamine production); *U.S. v. Tucker*, 313 F.3d 1259, 1266 (10th Cir. 2002) ("risk of personal injuries and property damage due to the volatile nature of the chemicals and the process of methamphetamine manufacture"); *U.S. v. Layne*, 324 F.3d 464, 467, 470 (6th Cir. 2003) ("Defendants used methamphetamine while operating the laboratory, which made the operation more dangerous"; "ephedrine reduction method of manufacturing methamphetamine involves the use of numerous dangerous and toxic chemicals"; "[d]uring the manufacturing process, some of these chemicals, which are highly flammable, present a threat of explosion."); *U.S. v. Spinelli*, 848 F.2d 26, 29-30 (2d Cir. 1988) (agent knew that defendant was thought to be producing methamphetamine; officer knew from his training that this production involved highly volatile chemicals and thought that defendant might try and destroy evidence by causing an explosion).

### B.   Possible Destruction of Evidence

Detective Morse also had reasonable suspicion that requiring the officers to give notice could result in the destruction of evidence.  In her affidavit, she stated that there was a possibility that simultaneous service could also result in destruction of evidence if officers announced their presence and that "methamphetamine manufactured [in] a clandestine laboratory environment are often manufactured in quantities that are easily concealed or destroyed." As stated above, the residences are close enough in proximity to enable residents to flee to or alert the residents of the other premises.  This would greatly increase the risk of  destruction of evidence, specifically, the methamphetamine, precursor chemicals, and equipment used to manufacture methamphetamine.

Detective Morse was also aware that Detective Joe Studstrup had previously conducted two controlled buys at Lund's residence and that the purchases were for approximately one gram of methamphetamine.  This was noted in the affidavit.  It was reasonable for Detective Morse to suspect that the amount of methamphetamine likely to be found at the residences to be searched could easily be destroyed, thus showing the necessity for a no-knock entry by law enforcement officers to prevent such destruction.

In *U.S. v. Hernandez*, it was noted that there could be no blanket exception to the knock-and-announce rule for all drug cases, but that the Supreme Court did recognize "that it is a frequent link and valid consideration." 252 F. Supp.2d 1190, 1193 (D. Kan. 2003) (citing *Richards*, 520 U.S. at 391).  In this case, the crime of drug manufacturing is not the only reason for the exception, and when combined with the other factors listed above, and taking into consideration the particular dangers associated with methamphetamine production, the no-knock

entry was reasonable in order to protect the officers.

## CONCLUSION

Accordingly, IT IS HEREBY ORDERED that Defendants Lund's and Carlson's Motions to Suppress [Docket ## 21 & 25] are DENIED.  The court finds that the search warrants were supported by probable cause and that, in any event, the officers relied on the warrant in good faith.  Moreover, the court finds that execution of the no-knock search warrant was constitutionally reasonable.

DATED this 15th day of March, 2006.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge

-14-